IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12 CR 782 |
| | ) | |
| ROBERT KOLBUSZ, | ) | Judge John Z. Lee |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Robert Kolbusz has been charged with seven counts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343. The Government alleges Defendant billed Medicare and private insurers based on false diagnoses of actinic keratosis (precancerous lesions) and the performance of medically unnecessary procedures. In this case, Defendant and the Government filed several motions *in limine*. For the reasons stated herein, the Court denies Defendant's motion to exclude evidence of patients not named in the indictment [57] [94], grants Defendant's motion to exclude a peer review analysis report [58], and denies Defendant's motion to exclude the expert testimony of Dr. Edward Ross [72]. The Court further grants the Government's motion to limit the expert testimony of Dr. David Goldberg [71].

**Discussion**

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Rulings *in limine* avoid delay and allow the parties the opportunity to prepare themselves and witnesses for the introduction or exclusion of the applicable evidence. *See Wilson v. Williams*, 182 F.3d 562, 566 (7th Cir. 1999);

*United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989). Trial courts have broad discretion in ruling on evidentiary issues before trial. *See United States v. Chambers*, 642 F.3d 588, 594 (7th Cir. 2011); *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 426 (7th Cir. 2000). The Court will only grant a motion *in limine* when the evidence is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997); *Betts v. City of Chi., Ill.,* 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011). Moreover, rulings on motions *in limine* are "subject to change when the case unfolds[.]" *Luce*, 469 U.S. at 41; *see also Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006). Indeed, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce*, 469 U.S. at 41-42.

## I. Defendant's Motions *in Limine*

### A. Patients Not Named in the Indictment

Defendant first moves to preclude the Government from introducing evidence regarding patients who were not specifically named in the indictment. In his motion, Defendant makes three principal arguments: (1) the evidence of patients outside of the indictment constitutes a constructive amendment to the indictment in violation of his rights under the Fifth Amendment; (2) the Government did not provide reasonable notice under Federal Rule of Evidence ("FRE") 404(b); and (3) the evidence is prejudicial, cumulative, and will cause undue delay under FRE 403. For the following reasons, the Court denies Defendant's motion.

First, Defendant argues that introducing patients not named in the indictment is a constructive amendment to the indictment. A constructive amendment to an indictment "can imperil a defendant's Fifth Amendment right to be informed of the nature and cause of the accusation against her[.]" *United States v. Ratliff-White*, 493 F.3d 812, 819-20 (7th Cir. 2007)

(internal citations omitted). "A constructive amendment to an indictment: is found where a 'complex set of facts' is presented to the jury during the trial which is distinctly different from the set of facts set forth in the charging instrument." *Id.* at 820 (citing *United States v. Kuna*, 493 F.3d 812, 818 (7th Cir. 1985)).

Here, the Government's introduction of patients not named in the indictment is not a constructive amendment to the indictment. The charging instrument sets forth a set of facts involving Defendant's alleged scheme to defraud Medicare and private insurers by billing for unnecessary medical services for hundreds of patients. *See* Indictment, Dkt. No. 1 at 5 (charging Defendant with mail and wire fraud and alleging that he engaged in a scheme to defraud by "submit[ing] false claims in this manner for hundreds of patients during the scheme, including, for example, Individuals A through G"). Although Defendant argues that the indictment must list each and every manner by which he perpetrated the alleged scheme, the Government need not enumerate each execution of the scheme in an indictment. *See United States v. Hammen*, 977 F.2d 379, 383 (7th Cir. 1992). Because the indictment alleges that Defendant's crimes were carried out through a scheme involving hundreds of patients, introducing evidence of patients who were allegedly used to perpetuate Defendant's scheme would not constitute a distinctly different set of facts than those contained in the indictment. *See United States v. Phillips*, 745 F.3d 829, 831-32 (7th Cir. 2014) (evidence of defendant's tax returns not specifically mentioned in the indictment alleging tax fraud not a constructive amendment); *see also United States v. Pless*, 79 F.3d 1217, 1220 (D.C. Cir. 1996) (holding "it is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme"). In much the same way, evidence of patients not specifically named in the indictment would support the offenses charged in the indictment, not another crime. *See United States v. Alhalabi*, 443

3

F.3d 605, 614 (7th Cir. 2006) (noting that "[t]he admission of evidence intricately related to the charged crimes . . . does not constructively amended the indictment"). Accordingly, Defendant's constructive amendment argument fails.

Next, Defendant argues that the Government violated FRE 404(b)(2) because it did not provide him with reasonable notice of its anticipated use of evidence regarding these other patients. Presumably, Defendant's position is that, because evidence of other patients relates to crimes other than those charged in the indictment, such evidence falls within the purview of FRE 404(b). But, as discussed above, evidence of patients not specifically named in the indictment would constitute evidence of Defendant's charged crime, not a different crime, and Rule 404(b) does not apply.

That said, even if facts regarding other patients were considered evidence of other crimes, the indictment put Defendant on notice that the Government could try to introduce evidence of these patients to prove Defendant's scheme. Additionally, in May 2013, the Government provided Defendant with the identities of all patients for whom Defendant submitted an allegedly false claim, and Defendant has had nearly sixteen months to review this evidence. Given the nature of the allegations in the indictment and the discovery provided by the Government to Defendant in May 2013, the Court finds that Defendant was provided sufficient notice under FRE 404(b)(2), if such notice were required. *See United States v. Blount*, 502 F.3d 674, 677-78 (7th Cir. 2007) (providing notice of FRE 404(b) evidence to defendant one week before trial was sufficient); *see also* Fed. R. Evid. 404 advisory committee's note (stating that "[o]ther than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request or disclosure will depend largely on the circumstances of each case.").

4

Finally, Defendant argues that introducing evidence of patients not named in the indictment is prejudicial, cumulative, and will cause undue delay under FRE 403.[1] Under FRE 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of" unfair prejudice, undue delay, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. Here, evidence of patients not named in the indictment, to the extent they were used as part of Defendant's scheme, would be probative of the alleged scheme, as well as Defendant's intent to defraud under 18 U.S.C. §§ 1341, 1343.

On the other side of the ledger, Defendant argues that evidence of other patients would be unduly prejudicial because the Government "cherry-picked" the patients to present at trial. By way of illustration, Defendant argues that by selecting only female patients, the Government "will prejudicially skew the jury to believe that Kolbusz only treated young females for the condition." Def.'s Mot. *in Limine* 6. These arguments are uncompelling.

As an initial matter, the Government has stated that it "does not plan to allege or argue that the defendant only treated young women or only committed fraud relating to his young female patients." Government's Response 5; *see also id.* 6 (noting that two of seven patients in the indictment were born in the 1940s and an additional patient is a middle-aged man). In any event, the Court does not see how introduction of other patient evidence would be unduly prejudicial, so long as they are being offered to prove that they were part of Defendant's scheme. Additionally, given the "small number" that the Government intends to introduce at trial, *id.*, the Court finds that the presentation of these additional patients will not be unnecessarily cumulative

---

[1] In a recently filed motion *in limine*, Defendant argues that the Government has failed to comply with the Court's May 6, 2013, Order, which directed the Government to provide Defendant with a bill of particulars. The Court has already overruled Defendant's objection. See Dkt. No. 32 ("The government has provided defense counsel and the Court a chart with additional information in response to the Courts 5/6/13 order granting defendant's motion for a bill of particulars. Defendant's objection that the document does not comply with the Court's 5/6/13 order is overruled."). Thus, the Court denies Defendant's recently filed motion *in limine* [94].

or cause undue delay (to the extent that it is otherwise at trial, Defendant may reassert these arguments at that time). Thus, the probative value of the additional patients not named in the indictment is not substantially outweighed by a danger of unfair prejudice, undue delay, or needlessly presenting cumulative evidence.

B. Peer Review Analysis

Next, Defendant moves to preclude the Government from introducing a peer review report which analyzes the billing practices of other physicians in Defendant's geographic area for the destruction of actinic keratosis [58]. Because the Government has stated that it does not intend to introduce the report at trial, the Court grants Defendant's motion.

C. Dr. Edward Ross

Lastly, Defendant moves to exclude the expert testimony of Dr. Edward Ross. The admissibility of expert testimony is governed by FRE 702 and the Supreme Court's seminal case, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). By its terms, Rule 702 allows the admission of testimony by an expert, someone with the requisite "knowledge, skill, experience, training, or education[,]" to help the trier of fact "understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. Experts are only permitted to testify, however, when their testimony is (1) "based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

*Daubert* requires the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to

hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("we 'give the district court wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Before admitting expert testimony, district courts employ a three-part analysis: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Bielskis*, 663 F.3d at 893-94. "The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire Co.*, 526 U.S. at 152). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

1. <u>Dr. Ross' Qualifications</u>

Defendant briefly argues that Dr. Ross is not qualified to testify as to whether an intense pulsed light machine ("IPL") or erbium laser can be used to treat actinic keratosis. Def.'s Mot. *in Limine* 15. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the

7

subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010). Based upon the present record, the Court concludes that Dr. Ross is sufficiently qualified to testify as to the use of IPL and erbium laser to treat actinic keratosis.

First, Dr. Ross possesses the necessary education, skill, and experience in this field. Dr. Ross received his Doctor of Medicine from Tulane University in 1986 and completed a three-year dermatology residency in 1992. *See* Ross C.V., Government's Resp., Ex. A at 1. From 1992 through 1994, Dr. Ross served as a staff dermatologist at a Naval Hospital in Beaufort, South Carolina, and from 1996 through 2006, he served a staff dermatologist and laser medicine specialist at the Naval Medical Center in San Diego, California. *Id.*, Ex. A at 2. From 2006 through the present, Dr. Ross has served as the director of the Laser and Cosmetic Dermatology Unit at Scripps Clinic in San Diego, California. *Id.*, Ex. A at 2. In his experience as a dermatologist, Dr. Ross frequently has treated patients with actinic keratosis using IPL in combination with a cream and has observed the use of IPL without a cream to treat actinic keratosis. *Id.* 13; Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1. Dr. Ross has also used erbium lasers to treat actinic keratosis. Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1-2.

In addition to his education and experience in treating actinic keratosis with IPL and erbium lasers, Dr. Ross has published numerous articles on the use of IPL, the use of other laser treatments, photo-damaged skin (which can include actinic keratosis), and the use of erbium lasers as a skin treatment. *See* Ross C.V., Government's Resp., Ex. A at 4-10; *id.*, Ex. C. Dr. Ross's professional training, experience, and relevant research qualify him as an expert to testify about how IPL and erbium lasers may be used to treat actinic keratosis.

2. Reliability of Dr. Ross's Opinions

Defendant next attacks a variety of Dr. Ross's conclusions as being unreliable. The Court addresses each argument in turn.

    a. Reliability of Dr. Ross's Opinion That Defendant Improperly Diagnosed Patients with Actinic Keratosis

At trial, Dr. Ross will opine that thirteen patients diagnosed with actinic keratosis by Defendant were unlikely to have actinic keratosis. Defendant challenges this conclusion as unreliable based upon the fact that Dr. Ross did not physically examine the patients in question.[2] The Court disagrees.

In reaching his opinions, Dr. Ross relied upon his professional experience as a dermatologist treating and diagnosing actinic keratosis, as well as relevant medical literature. Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1, 6-8. He also reviewed the medical files for each patient, which included a medical history, skin questionnaires, physical assessment notes, lesion/rash diagrams, treatment records documenting the number of lesions, and photographs of the patient's skin. *Id.*, Ex. A-2 at 1-15; Government's Resp. 6-7.

Defendant cites *O'Conner v. Commonwealth Edison*, 13 F.3d 1090, 1106 (7th Cir. 1994), for the proposition that Dr. Ross should have conducted actual physical examinations. *O'Connor*, however, addressed an expert testifying as to the *cause* of a patient's medical problem. 13 F.3d at 1107 (7th Cir. 1994) (noting that the expert "has not come forward with any other support for his causation opinion"). Here, Dr. Ross does not plan to testify as to the cause of the patients' lesions, but rather he intends to rule out actinic keratosis as a likely diagnosis for

---

[2] In his reply, Defendant for the first time argues that Dr. Ross is unqualified to opine that Defendant improperly diagnosed patients with actinic keratosis. Def.'s Corrected Reply 2-3. "Arguments that are raised for the first time in a reply brief are waived." *Ippolito v. WNS, Inc.*, 864 F.2d 440, 455 n.12 (7th Cir. 1988). Even if Defendant had raised this argument in his motion, the Court finds it unpersuasive. As discussed above, Dr. Ross has significant experience diagnosing, treating, and researching actinic keratosis and is qualified to opine on Defendant's purported improper diagnoses.

Defendant's patients. Defendant also cites *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901 (7th Cir. 2007), to argue that Dr. Ross should have considered differential diagnoses in formulating his opinions. Again, Defendant's argument is misplaced. Differential diagnoses address the cause of medical problem; Dr. Ross will not opine as to causation. *See Ervin*, 492 F.3d at 903 (explaining that the goal of a differential diagnoses "is to identify the last remaining, or most probable, 'ruled in' *cause* of a medical problem" (emphasis added)). Because Dr. Ross does not intend to testify as to causation, Defendant's arguments are unavailing.[3]

Defendant also contends that scientific literature in this area mandates that actinic keratosis only be diagnosed upon a physical examination of the patient. Although the literature cited by Defendant generally supports the notion that, in certain instances, a physical examination is helpful in identifying actinic keratosis lesions due to the texture of the affected area, the literature does not mandate a physical exam when diagnosing actinic keratosis.[4] Furthermore, to the extent that the texture of the affected area is relevant to a diagnosis of the patients in question, such information was contained in the patient files in the form of photographs and medical notes. Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-2 at 1-15. As a result, the fact that Dr. Ross did not conduct actual physical examinations goes towards the weight of his testimony rather than its admissibility. *See Loeffel Steel Prods., Inc. v. Delta*

---

[3] Even if Dr. Ross were to testify as to the cause of the patients' medical conditions, a physical exam might not be necessary. *See, e.g., Ortiz v. City of Chi.*, 656 F.3d 523, 535–37 (7th Cir. 2011) (medical expert was reliable even though he had not personally examined the plaintiff before her death and thus based his conclusions about the cause of death from analysis of an autopsy report and other medical records); *Quirin v. Lorillard Tobacco Co.,* No. 13 C 2633, 2014 WL 716162, at **4–6 (N.D. Ill. Feb. 25, 2014) (expert testimony about the causes of patient's disease was admissible when the expert based his opinion on the patient's medical records but did not examine the patient himself).

[4] *See, e.g.*, Def.'s Mot. *in Limine*, Ex. C at 3 (noting that "[t]he underlying basal cell carcinoma is usually quite subtle on clinical examination and may only be appreciated by palpation"); *id.*, Ex. C at 17 (describing a certain type of actinic keratosis as "palpable but not visible"); *id.*, Ex. C at 21 (noting that actinic keratosis may be identified by color but that skin palpation "*may* be more important that visual inspection in making the diagnoses" (emphasis added)).

*Brands, Inc.,* 372 F. Supp. 2d 1104, 1119–20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility").

Finally, Defendant contends that Dr. Ross's opinion is not reliable because it is based, in part, on poor quality photographs and stereotypes. Def.'s Mot. *in Limine* 9-11. But these arguments also are unpersuasive. First, Dr. Ross incorporated the quality of the photographs into his analysis. Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1, 6-7. Second, as mentioned above, Dr. Ross reviewed patient charts encompassing a broad demographic of patients. In the end, the quality of the photographs and the weight given by Dr. Ross to certain factors go towards the weight to be afforded his expert opinion, not its admissibility. *See Daubert,* 509 U.S. at 596; *Lees v. Carthage Coll.,* 714 F.3d 516, 526 (7th Cir. 2013).

For these reasons, the Court finds that Dr. Ross's methodology for determining that Defendant's patients likely did not have actinic keratosis is sufficiently reliable to be offered at trial. Accordingly, the Court denies Defendant's motion to preclude Dr. Ross's testimony regarding the accuracy of Defendant's diagnoses.

> b. <u>Reliability of Dr. Ross's Opinion Regarding the Efficacy of Treatment Alternatives</u>

Dr. Ross also opines that (1) the settings Defendant used for his erbium lasers were likely too low to treat actinic keratosis lesions; and (2) the manner in which Defendant used IPL was ineffective to treat actinic keratosis. Defendant contends that these two opinions are unreliable.

As for the use of erbium lasers, Defendant objects to Dr. Ross's statement that the erbium laser settings used by Defendant are "more like pruning and taking the top off of any potential lesions, rather than destruction." This opinion must be deemed unreliable, according to Defendant, because Dr. Ross does not cite to any scientific literature to support this conclusion.

*See* Def.'s Mot. *in Limine* 11-12.[5]  But Dr. Ross has professional experience treating actinic keratosis with erbium lasers and has studied the various settings and uses for the laser. Government's Resp. 14; Ross C.V., *id.*, Ex. A at 1-3; Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1-3.  *See also Kumho Tire Co.*, 526 U.S at 150 (noting that FRE 702's inquiry is a "flexible one" and that in certain cases "the relevant reliability concerns may focus upon personal knowledge or experience").  Furthermore, Dr. Ross has published numerous articles on the erbium laser and its various uses.  Government's Resp., Ex. C.  Although Defendant notes that Dr. Ross's publications do not specifically address the appropriate erbium laser setting used to treat actinic keratosis, Dr. Ross's research demonstrates his general familiarity with the use of erbium lasers and supplements his own experience treating actinic keratosis.  Given Dr. Ross's experience treating actinic keratosis with erbium lasers at various settings along with his general research experience with erbium lasers, the Court finds the methodology underlying Dr. Ross's testimony reliable.

Defendant also challenges Dr. Ross's conclusion that the manner in which Defendant used IPL was ineffective to treat actinic keratosis.  As described above, Dr. Ross has many years of experience as a dermatologist treating actinic keratosis, and he also has conducted extensive research on the use of IPLs.  Furthermore, Dr. Ross uses IPL in his own practice to treat actinic keratosis in combination with a cream and has observed that the manner in which Defendant uses IPL without a cream "is ineffective in destroying [actinic keratosis]."  Government's Resp. 13; *see* Ross Disclosures, Def.'s Mot. *in Limine*, Ex. A-1 at 1-2.  Given Dr. Ross's experience

---

[5]  Defendant also claims that Dr. Ross "contends that only the higher settings he himself uses [for erbium lasers] are effective to treat AK lesions."  Def.'s Mot. *in Limine* (citing Ex. A-1 at ¶ A9).  This mischaracterizes Dr. Ross's testimony.  Instead, Dr. Ross intends to testify "that he has used Erbium lasers to treat actinic keratosis lesions, but using higher settings, a smaller spot size, and more passes, compared to what is shown in Dr. Kolbusz's notes and records."  Ross Disclosure, *id.*, Ex. A-1 at ¶ A9.  This testimony is based on Dr. Ross's personal experience as a physician treating actinic keratosis with erbium lasers, and the Court finds this particular statement sufficient reliable for trial.

treating actinic keratosis with IPL in combination with a cream, along with his first-hand observations of using IPL without a cream to treat actinic keratosis, the Court finds the methodology underlying Dr. Ross's testimony reliable.

### c. Reliability of Dr. Ross's Various Other Collateral Opinions

Finally, Defendant challenges Dr. Ross's collateral opinions as unreliable and points to five opinions as examples.[6] Defendant generally argues that Dr. Ross does not cite to any specific data, testing, or generally recognized treatises to support his conclusions. Because the parties' arguments are undeveloped at to this issue and the present record is not sufficient to determine whether the testimony "clearly would be inadmissible for any purpose[,]" the Court denies Defendant's motion. *Jonasson,* 115 F.3d at 440. To the extent these issues become ripe during the trial, Defendant may reassert his arguments at that time.

## II. Government's Motion to Limit the Expert Testimony of Dr. David Goldberg

Turning to the Government's motion, the Government contends that a portion of Dr. David Goldberg's expert testimony should be barred. Specifically, the Government moves to prevent Dr. Goldberg from testifying that dermatologists "*commonly*" use IPL to destroy actinic keratosis [71]. As mentioned above, to be allowed to testify as an expert: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Bielskis*, 663 F.3d at 893-94.

---

[6] The five principal opinions that Defendant challenges address: (1) the color and frequency of pigmented actinic keratosis lesions; (2) the treatment of the body for numerous actinic keratosis lesions; (3) the dermatology community's view of subclinical actinic keratosis; (4) whether most dermatologists would define actinic keratosis as "scattered tan macules"; and (5) whether it was "normal" for Defendant to see actinic keratosis patients as often as he did. Def.'s Mot. *in Limine* 13-14.

The Government contends that Dr. Goldberg's testimony that IPL is "commonly" used to treat actinic keratosis should be excluded because the opinion was formed using an unreliable methodology, is not based upon sufficient facts or data, and is the product of unreliable principles and methods.

Defendant states that Dr. Goldberg will opine that Defendant's use of IPL is "effective" to treat actinic keratosis, not that IPL is "commonly" used to treat actinic keratosis. Def.'s Resp. 1 ("Dr. Goldberg will opine that IPL without the use of a photosensitizing agent, the way Dr. Kolbusz uses it, is effective to treat actinic keratosis."). Because Defendant does not challenge the substance of the Government's motion, the motion is granted.

## Conclusion

For the reasons stated herein, the Court denies Defendant's motion to exclude evidence of patients not named in the indictment [57] [94], grants Defendant's motion to exclude a peer review analysis report [58], and denies Defendant's motion to exclude the expert testimony of Dr. Edward Ross [72]. The Court further grants the Government's motion to limit the expert testimony of Dr. David Goldberg [71].


SO ORDERED                                    ENTER:  8/26/14

                                              _____
                                              **JOHN Z. LEE**
                                              **United States District Judge**